Filed 2/10/21  P. v. Casey CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>PASCAL CASEY,<br><br>    Defendant and Appellant. | F078388<br><br>(Super. Ct. No. F16902891)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  James M. Petrucelli, Judge.

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kathleen A. McKenna and Timothy L. O'Hair, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Pascal Casey was convicted by a jury of committing three sexual offenses during a single incident against a child for whom he was a nanny.  On appeal, he contends judicial bias deprived him of his federal rights to due process and a fair trial.

He also contends the fines, fees, and assessments imposed by the trial court violate his right to due process because he is unable to pay. To the extent these contentions were forfeited, he contends his counsel provided ineffective assistance. He also argues his abstract of judgment contains a clerical error.

We reject Casey's first two contentions but agree his abstract of judgment contains an error. We order that the abstract of judgment be amended and otherwise affirm.

## STATEMENT OF THE CASE

An information filed May 31, 2016, charged Casey with committing a lewd act upon a child under the age of 14 (Pen. Code,[1] § 288, subd. (a); count 1), sexual penetration of a child under the age of 14 (§ 289, subd. (j); count 2), and oral copulation or sexual penetration with a child 10 years of age or younger (§ 288.7, subd. (b); count 3). A jury convicted Casey on all three counts. On count 3, he received an indeterminate term of 15-years-to-life, and the sentences on counts 1 and 2 were stayed pursuant to section 654. The court also imposed various fines, fees, and assessments.

## STATEMENT OF FACTS

### A. Prosecution evidence

Because she worked two jobs and was also in school, Nancy needed a nanny to help care for her 10-year-old daughter, M.[2] Nancy posted an ad on Facebook offering room and board in exchange for live-in nanny services and Casey responded. Nancy and Casey had known each other for about eight years because they were part of the same Native American community. Nancy considered him a friend. Casey moved into Nancy's home and began serving as M.'s nanny approximately a week before the sexual assault incident.

---

[1] Unlabeled statutory references are to the Penal Code.

[2] We use first names or initials for the victim and witnesses to protect their identities. M. was 12 years old at the time of trial.

2.

In the afternoon of May 8, 2016, M. was sitting on the couch in the living room of her home watching television. Casey, who was the only other person there, began rubbing her back and proceeded touching her buttocks over her clothing. M. moved from the couch over to the bed that was also in the living room.

Casey followed M. to the bed. He put his legs on top of her legs and his hand underneath her clothes and touched her vagina. M. did not want Casey to touch her vagina; it felt wrong and it "hurt." M. said "ow" and Casey momentarily stopped before resuming touching her vagina. He also licked her cheek, which felt "nasty."

As this was happening, M.'s then 19-year-old brother, Michael, came home from work and found M. lying on her back on the bed in the living room with Casey between her legs. Michael could not see Casey's hands, but he could see M. appeared frightened, and it appeared to Michael that Casey was "playing with her." Michael closed the front door to make his presence known and Casey immediately jumped up. Michael went to the kitchen and Casey went to his room.

Michael told M. to get dressed because he was taking her to a party at his girlfriend's house. There was no party, however, and Michael instead drove M. to Nancy's workplace. M. and Michael did not speak during the drive. When they arrived at Nancy's workplace, Michael went inside and told Nancy what he saw. Nancy came outside and asked M. what happened. M. told Nancy that Casey was on top of her and "hurt [her] private," and Nancy fell to her knees and screamed. As he was leaving, he told Nancy to call the police.[3]

Nancy called 911 and an ambulance arrived and transported M. and Nancy to the hospital where a rape kit was administered. M. appeared distraught during the ambulance

---

[3] Michael testified slightly differently. He testified that they got to Nancy's work, got out of the car, and went to the front door of the workplace. Michael opened the door, stood there, and told M. to go to Nancy. M. ran inside and whispered in Nancy's ear, at which point Nancy fell to her knees and started crying. Michael then took off.

ride.  She was shaking and crying and holding Nancy tightly.  Nancy called 911 again from the ambulance because she was afraid Michael was going to hurt Casey.**4**

Michael confronted Casey at Nancy's house and told Casey he saw him touching M.  Casey, who had been packing up his belongings when Michael arrived, denied any wrongdoing.  Michael struck Casey with a baseball bat and dragged him outside where Michael's friend also "hit [Casey] … a couple of times."  Casey twice tried to run away, but Michael and his friend detained Casey until police arrived.

Michael told the responding officer he saw movement under a blanket on the bed in the living room, and as soon as he walked in, Casey flipped the blanket off and jumped off the bed.  Michael was surprised to see M. underneath the blanket.  Casey and M. were clothed.

### M.'s statements before trial

M. provided several statements about the incident prior to trial.  She made her first statement to a police officer at the hospital on the day of the incident.  M. told the officer she was watching television when Casey put a blanket over himself and her, put his hand inside of her underwear, and inserted his finger inside her "middle spot."  M. later would tell Nancy she lied to this police officer about a blanket being over her during the incident.

M.'s next statement was taken at a special interview center for children.  The interview was set up by a police detective and conducted by a child psychologist.  The statement was recorded and played for the jury.  Not long into the interview, M. became uncomfortable.  Nancy was brought into the interview room and calmed M. by singing to her.  M. then explained she was lying on her back and Casey put his body on top of hers and put his hand inside of her vagina.  She told the interviewer she would "kill [her]self"

---

**4** On cross-examination, Nancy explained that she made this second 911 call after speaking with Michael and learning that Michael had assaulted Casey.

4.

if she had to keep talking about the incident. She said she did not want to talk about it because it was "nasty." She also said she did not like Casey anymore. She nevertheless continued to answer questions, and ultimately stated she felt "amazing" after having told her story.

Lastly, on the eve of the original trial date, M. spontaneously began talking to Nancy about the incident while the two were lying in bed. Nancy recorded M.'s statement on her cellphone without telling M. she was being recorded. This recording was played for the jury. M. said she was on the couch when Casey began rubbing her back and then buttocks inside of her shorts. M. got scared and went to the bed and Casey followed her. On the bed, Casey touched her "private" and licked her. M. told Nancy she was afraid Nancy would "hate [her]" for lying to the police about the incident taking place on the couch instead of on the bed.

### Physical evidence

On May 8, 2016, a nurse took swabs from areas on M.'s body that M. said Casey touched. Another examiner took swabs from Casey. No conclusion could be drawn from any of the DNA evidence. While there were no injuries to M.'s hymen, she did have redness around her labia minora, which is not common.

## B.    Defense evidence

Casey's niece testified on his behalf.[5] She had known him her whole life, over 50 years, and lived with him for more than five years along with her daughter and companion. Casey worked for the Fresno American Indian Health Project. He transported people to doctors' appointments, purchased supplies for people, and taught beadmaking. Casey transported children as part of his job and taught arts and crafts to children. He was considered a mentor and an elder in his Native American community.

---

[5] Casey was 64 years old at the time of the offense.

## DISCUSSION

**I.     Judicial bias**

Casey contends the superior court judge who presided over his trial was biased against the defense.  He complains of three separate instances in which the trial court allegedly demonstrated its bias against defense counsel and the defense generally.  He claims these instances, cumulatively if not individually, undermined his due process right to be tried by an impartial judge, his due process right to a fair trial, and affected his counsel's ability to provide effective assistance.  In one of these complained-of instances, Casey claims the judge assumed the role of the prosecutor during defense counsel's cross-examination of Michael.  We address each instance in turn and conclude they do not demonstrate the court was biased against the defense.

### A.     Trial proceedings

#### 1.     Bias during M.'s cross-examination

The defense's obvious trial strategy was to create reasonable doubt by focusing the jury on discrepancies in each of M., Michael, and Nancy's respective statements through cross-examination.  The following colloquy occurred during defense counsel's cross-examination of M.:

> "[DEFENSE COUNSEL]:  Okay.  So you knew that you were going to—you didn't know whose party it was for, but you knew that you were going to be going to your—your brother's girlfriend's family's house?
>
> "[M.]:  Yes.  I knew.
>
> "[DEFENSE COUNSEL]:  Do you remember telling the police that Michael asked you on that day if you wanted to go with him to his girlfriend's house for the party, do you remember telling that to the police?
>
> "[M.]:  No.
>
> "[DEFENSE COUNSEL]:  If the police officer—or if a police officer says that you said that, that would not be true, right?
>
> "[M.]:  What would be true?

6.

"[DEFENSE COUNSEL]: If a police officer said, [M.] told me that Michael didn't tell her about the party until that day, that would not be true, right?

"[M.]: Right.

"[DEFENSE COUNSEL]: Because the truth is, you knew about this party a couple of days before?

"[M.]: Yes.

"[DEFENSE COUNSEL]: Okay. Now, did you go directly to go change in your room?

"[M.]: Yes.

"[DEFENSE COUNSEL]: Is that the truth of what you are telling the people today?

"[M.]: Yes.

"[DEFENSE COUNSEL]: Okay. Do you remember telling the police that when your brother came in, you were hungry?

"[M.]: No.

"[DEFENSE COUNSEL]: Do you remember telling the police that you were looking for chips, and I'm going to show you what has been marked Exhibit Number 4, and you have identified the dining room area as the center area, do you remember telling the police that you went into the kitchen area looking for chips and you couldn't find any chips?

"[M.]: No.

"[DEFENSE COUNSEL]: Isn't it true, [M.], you then told the police that you then remembered that there were chips in your mom's room so you went to look for chips in your mom's room?

"[M.]: I don't remember that.

"[DEFENSE COUNSEL]: Okay. But that wouldn't be true if a policeman said you said that because you are telling us today you were not hungry and you never went to look for chips, right?

"THE COURT: Counsel want to approach.

7.

[An off-the-record discussion was held.]

"THE COURT: All right, we're back on the record. Both counsel are present. Ladies and gentlemen, we're going to take our noon recess at this time. Actually, our recess for the day. You are ordered back at 9:00 a.m. tomorrow morning …."

No further discussions were held on the record that day. The next morning began with the following discussion outside the presence of the jury:

"THE COURT: Calling case number F16902891, this is People of the State of California versus Casey. Both counsel are present, the defendant is present, defense investigator Pinto is present, the jury nor alternates are present. The witness that is currently on the stand is not present at this time.

"Ms. Benninghoff.

"[DEFENSE COUNSEL]: Your Honor, yesterday we had a situation occur where I was interviewing, or I was cross-examining [M.] and the Court asked that we meet at sidebar, which is really in the hallway. I know that there was a disagreement, to put it lightly, with respect to the Court's interpretation as to how I was cross-examining. My concern is that it got relatively loud and I don't know if the jurors actually heard any of the discussion—

"THE COURT: Ms. Bennington, let me—

"[DEFENSE COUNSEL]: Hoff, Ms. Benninghoff.

"THE COURT: Ms. Benninghoff, as soon as you started yelling at the Court, I moved it to chambers for that reason, let's make that clear. So I'm not concerned at all about the jury hearing it. As soon as you raised your voice, I moved it into chambers.

"[DEFENSE COUNSEL]: Your Honor, okay, all right. That is not my interpretation of what actually happened.

"THE COURT: Well, that's fine.

"[DEFENSE COUNSEL]: I asked the Court a number of times to stop yelling at me.

"THE COURT: Okay. Ms. Benninghoff, listen. Let me explain something to you, when you raise your voice to the Court, first, I'll take you to

8.

chambers and then, secondly, yes, I'm going to raise my voice to get your attention. Now, if you have some issue regarding your cross-examination of the witness or some evidentiary issues, I would more than be happy to entertain those. But there was a disagreement, and I don't appreciate you raising your voice. You are a very loud and boisterous person. And you tend to yell when you want to make your point, and you did, and I moved you into chambers.

"Now, having said all of that. That really is not relevant to the trial. What we need to do is figure out if you are unhappy about my indications and that was that the witness had been brought to tears and I have an obligation to protect a 12-year-old witness. So I am not going to limit you. I'm going to admonish you if I think that you are causing distress for the witness.

"[DEFENSE COUNSEL]: Okay. Can I make a record, Your Honor, please, without the Court interrupting? I disagree strongly with what the Court just indicated. I asked the Court to stop yelling at me and that is when the Court moved into chambers, I asked the Court twice. I was not bringing the witness to tears. For the record, the witness was in tears when she walked into court in the morning.

"THE COURT: But she was not in tears—again, until you started your cross-examination and I allowed it for, I think, at least a half hour or so.

"[DEFENSE COUNSEL]: Your Honor, that I disagree.

"THE COURT: Well, you can disagree.

"[DEFENSE COUNSEL]: I'm not done making a record, can I finish, Your Honor? While the prosecution was questioning this witness, she was in tears. So the representation that somehow I was making the witness cry, I completely 100 percent disagree.

"THE COURT: Okay.

"[DEFENSE COUNSEL]: I even spoke to my investigator and asked whether or not it was my tone or something with respect to the witness and I—there was no agreement with respect to that.

"Now, I will start off today—I tend to be—I don't—I have a hearing problem, like the Court indicated that the Court has—

"THE COURT: Then don't yell right now. You are yelling right now. And while the record does not reflect it, I don't appreciate it. You can speak softly and I can hear you. So why don't you just proceed with your

9.

questioning and we'll see how it proceeds. I did admonish you that I felt like you were badgering the witness.

"[DEFENSE COUNSEL]: I understand that.

"THE COURT: I did not interrupt your questioning, that is why I had a sidebar. We'll make determinations as appropriate and I certainly want you to do whatever you think is appropriate for your defense of Mr. Casey.

"[DEFENSE COUNSEL]: I'm just asking that instead of our conferences being in the hallway, particularly in light of how loud it became, with respect to whatever position the Court or I have, that perhaps maybe we have them in chambers because I don't want the jury to hear any communication.

"THE COURT: Ms. Benninghoff, whatever you would like is fine with the Court. If you would like me to remove the jury and have all sidebars on the record, I'll do that too. I don't mind that. I just – I'm concerned. We have a juvenile, very young, and I would tend to agree with your comment earlier, she's a very immature 12-year-old and I'm concerned about her well-being.

"You are correct, she was crying earlier during Ms. Baldovi's questioning, but there was a different approach taken and I would just ask that when you see her under distress that you maybe take time, and if you think it's appropriate, ask the Court for a break and I'll be happy to do that too.

"[DEFENSE COUNSEL]: I sure will, Your Honor, and that is what I did yesterday. I sure will. I'll take the court's direction like I did yesterday and do that.

"THE COURT: Thank you. Are we ready to proceed?

"[THE PROSECUTOR]: They're on their way."

The jury entered the courtroom and defense counsel's cross-examination of M. continued.

### 2. Bias during cross-examination of Michael

The following colloquy occurred during the prosecution's direct examination of Michael:

"[THE PROSECUTOR]: Did you see Pascal's head when you came in?

"[MICHAEL]:  Yes.

"[THE PROSECUTOR]:  Where was his head, if you can point with the laser pointer.

"[MICHAEL]:  Okay.

"[THE PROSECUTOR]:  And he's pointed ….

"THE COURT:  In the middle of the bed.

"[MICHAEL]:  You gotta remember, she was laying down.

"[THE PROSECUTOR]:  What did you say?

"[MICHAEL]:  She's laying down and he's right there on the side, well, on the bed with her.

"[THE PROSECUTOR]:  What was he doing?

"[MICHAEL]:  Touching her.

"[THE PROSECUTOR]:  How did you now he was touching her?

"[MICHAEL]:  Because I could see.

"[THE PROSECUTOR]:  What did you see …."

"[MICHAEL]:  She's laying there, and … she's looking down.  I could tell she's scared.

"[DEFENSE COUNSEL]:  Objection.  Nonresponsive and speculation.

"THE COURT:  Overruled.  That was his observation.

"[MICHAEL]:  … I could see him, right there between her legs, his head.  I can't see his hands.  I can see his head in between her legs right there.  So I can't see his hands exactly.

"[THE PROSECUTOR]:  So you couldn't see his … hands?

"[MICHAEL]:  His hands exactly where they're, you know, I know he was doing something, though, because I could see his head and he's laying right there between her.

"[THE PROSECUTOR]:  When you say he's laying right there between her … what are you talking about between her.

11.

"[MICHAEL]: My sister. How he's, like, on her between … her legs."

The following is from defense counsel's cross-examination of Michael:

"[DEFENSE COUNSEL]: Okay. All right, and the first thing that you saw when you walked in the door was your sister was lying on her back, correct? That is what you told Ms. Baldovi, that your sister was lying on her back, correct?

"[MICHAEL]: Not—when I walked in, I looked to the left, and she was on the bed, yeah.

"[DEFENSE COUNSEL]: Okay.

"[MICHAEL]: She was on her back and he was right there.

"[DEFENSE COUNSEL]: Do you understand the question? When you walked in and you first looked over, what you told Ms. Baldovi is that you saw your sister lying … on her back, is that—

"[MICHAEL]: On the bed, yeah.

"[DEFENSE COUNSEL]: On the bed okay. And then you told Ms. Baldovi that my client was lying on top of her in between her, correct?

"[THE PROSECUTOR]: Objection. Misstates the evidence.

"[DEFENSE COUNSEL]: I have that written.

"THE COURT: Well, it is great you have it written down but I'll sustain the objection. I think you need to ask him if you want to ask him what his testimony was because I don't recall the testimony being that.

"[DEFENSE COUNSEL]: Okay.

"[DEFENSE COUNSEL to Michael]: Isn't it true, sir, that you indicated that my client was laying in between your sister?

"[THE PROSECUTOR]: Objection. Misstates the evidence.

"THE COURT: Well, she's—I'll sustain the objection. Why don't you just ask him what he observed again?

"[DEFENSE COUNSEL to Michael]: What did you observe, [Michael]?

12.

"[MICHAEL]: When I walked in, I looked to my left and I seen my sister on the bed, and he was, yeah, down there, playing with her.

"[DEFENSE COUNSEL]: Okay. Now, let me be specific. Isn't it true on direct, when you were talking to Ms. Baldovi, that you indicated that Pascal was laying in between her?

"[THE PROSECUTOR]: Object. Misstates the evidence.

"THE COURT: That does—sustained. Rephrase your question.

"[DEFENSE COUNSEL]: Was Pascal laying in between your sister? Sir, do you not understand the question?

"[MICHAEL]: Not really.

"[DEFENSE COUNSEL]: Okay. Was Pascal, his body, laying in between your sister?

"[MICHAEL]: I don't know how to say yes or no—yes and no to that, because when I walked in I seen her on her back and he was down there on the, yeah, on the bed with her, playing with her.

"[DEFENSE COUNSEL]: Okay. What was his position? Explain to the jury, what physically was his position?

"[MICHAEL]: Yeah, I guess, like, laying down or, like, I don't know. Laying down, crouched over on his knees, or, like, I don't know."

"[DEFENSE COUNSEL]: So he might have been on his knees?

"[MICHAEL]: He was between her, I just seen that. That's it. When you had asked me if I seen any other body parts on him—

"[DEFENSE COUNSEL]: Your Honor—

"THE COURT: Overruled. He's trying to explain a very difficult question that you formulated.

"[DEFENSE COUNSEL]: Your Honor, may we approach?

"THE COURT: Ladies and gentlemen, I'm going to ask that we take a brief recess. […]

[The jury left the courtroom.]

13.

"THE COURT:  The witness is also excused from the courtroom.  […]

"THE COURT:  The jury, the alternates and the witness have left the courtroom.  Yes, Ms. Benninghoff.

"[DEFENSE COUNSEL]:  Your Honor, Number 1, I need to inquire if every time I want to approach, is the Court going to excuse the jury?  Because if that is the case, I don't want the jury to ultimately be angry with me if I have a question or concern with the Court.  I just need to know for strategic reasons if that is the Court's intention throughout this trial.

"THE COURT:  I thought I made it clear yesterday, if not, I will make it clear today that there will be no off the record conversations with you, Ms. Benninghoff.

"[DEFENSE COUNSEL]:  Okay.

"THE COURT:  Now, to that end, my recollection is that he's having a hard time testifying about it apparently.  But my recollection of the evidence was that it wasn't clear where his body was, I'll give you that.  But his head was down there and that is my recollection of the evidence.  Ms. Baldovi, you may have a different recollection, but we can read it back if you would like.

"[DEFENSE COUNSEL]:  I would like that read back.  Because my concern is when the Court is making statements to … me in front of the jury, like, he's trying to answer a very difficult question, why don't you do X, Y, and Z, it does not leave the jury with a very good impression of me.

"THE COURT:  I didn't say X, Y, and Z.  I said that it was a very difficult question and I asked you to rephrase the question.

"Now, if she makes an objection that I believe is correct, I'm going to sustain it.  If I can help you in some way, I'll do that.

"Now, as a practical matter, I think you need to help this witness out and get what you want out of him.  So if we can read that back and then you can be direct to him, we have, it appears to me, some simple witnesses and that is concerning always because you lawyers ask complicated questions sometimes.  And I think that the jury is certainly aware if a question is difficult and if the witness is having a difficult time answering it."

The court reporter read back the portions of the prosecutor's questioning of

Michael where Michael testified:  "I can see his head in between her legs right there";

"… because I could see his head and he's laying right there between her"; and that "… he's like, on her, between her—on her legs."

The court reversed its ruling on defense counsel's objection: "I think it's clear, and that is fine, Ms. Benninghoff, you can proceed. The objection is reversed and overruled."

Defense counsel proceeded to cross-examine Michael regarding his testimony on direct concerning what he had seen when he opened the door to his mother's house. Michael admitted to guessing about some of what he had seen. In response to being asked about his prior testimony regarding Casey's body position when lying in between M., he said, "So that was just a guess on what I seen. I just remember seeing his head." He also could not say if a blanket covered the pair. In response to what he saw Casey doing, he replied, "I couldn't quite see. I couldn't see his hands."

### 3. Trial judge's interaction with Michael

The following is also from defense counsel's cross-examination of Michael:

"[DEFENSE COUNSEL]: Were you present when [M.] talked to your mother about Pascal touching her?

"[Michael]: Yes, I was present.

"[DEFENSE COUNSEL]: Could you hear in your mom's ear what [M.] was telling your mother?

"[Michael]: No.

"[DEFENSE COUNSEL]: So as you sit here, you don't know what [M.] said to her, correct?

"[Michael]: Correct.

"[DEFENSE COUNSEL]: … Did you ever see [M.] on a couch being molested or inappropriately touched by Mr. Casey?"

"[MICHAEL]: No.

15.

"[DEFENSE COUNSEL]: Is that something you just don't remember or is that something you really do—

"[MICHAEL]: No. That is something that was false. That is something that my mom had said. She said that she wasn't knowing what—what it was, the situation—

"[DEFENSE COUNSEL]: When did your mom say that [M.] was on a couch?

"[MICHAEL]: I don't know when she said it.

"[DEFENSE COUNSEL]: Well, how do you know she said it? What made you promptly say that?

"[MICHAEL]: Because she said, like, after the incident, my mom had said, I don't know why it went in my mind why I said [M.] was on the couch. And I know my sister was afraid and she agreed with it, too, I guess, with the cops. But my mom didn't—she wasn't knowing, and my sister being scared, you know, I guess she agreed with what my mom said. But I told my mom it was—nothing was on the couch, it was on the bed. So I don't know how that part got all—

"[DEFENSE COUNSEL]: Let's go back. We're going to talk about that. So when did your mom make this statement that this occurred on the couch?

"[MICHAEL]: I don't know when she made that statement.

"[DEFENSE COUNSEL]: When did you find out that your mom made a statement that—listen to the question. When did you find out that your mom made a statement about this all occurring on a couch?

"[MICHAEL]: After … that day.

"[DEFENSE COUNSEL]: When?

"[MICHAEL]: I don't know exactly when. Probably like—

"[DEFENSE COUNSEL]: Where were you?

"[MICHAEL]: I don't know. […] I can't remember.

"[DEFENSE COUNSEL]: Well, you can remember your mom making a statement and you can remember – I'm not done.

16.

"[THE PROSECUTOR]: Objection. Argumentative.

"THE COURT: Sustained. Sir, you need to … listen to the question.

"[MICHAEL]: I'm trying my best.

"THE COURT: I know you are and you need to maybe slow down a little bit, Ms. Benninghoff.

"[DEFENSE COUNSEL]: [Michael], you just went on a narrative telling this jury about your mom said it was on the couch, she didn't know, I think my sister was scared. When did you, in relation to when this incident took place, when did you hear your mom say that this happened on the couch, explain that to the jury?

"[MICHAEL]: I didn't. I didn't hear her say that statement to whoever she said to the cops, I'm assuming, she said that to—

"[DEFENSE COUNSEL]: How do you know she made a statement to the cops about something being on—

"[MICHAEL]: I didn't.

"[DEFENSE COUNSEL]: Let me finish.

"[MICHAEL]: Okay.

"[DEFENSE COUNSEL]: Take a deep breath and I'll do the same. When did you hear or find out that your mom made a statement to the cops about something being on a couch?

"[MICHAEL]: I don't remember. But probably could have been that day or the next day, I really don't remember.

"[DEFENSE COUNSEL]: What were the circumstances? What was going on when you heard that your mom had made a statement to the police or whoever about this occurring on a couch?

"[THE PROSECUTOR]: Objection. Compound. He stated he doesn't remember when.

"THE COURT: Sustained as to compound. Rephrase your question.

"[DEFENSE COUNSEL]: Who was around when you found out that your mom made a statement that all this occurred on a couch?

17.

"[THE PROSECUTOR]: Objection. Hearsay.

"[DEFENSE COUNSEL]: It's—

"THE COURT: Overruled.

"[MICHAEL]: I don't—remember.

"[DEFENSE COUNSEL]: Okay. How were you made aware that your mom made a statement to the police?

"[MICHAEL]: I don't remember. I really don't remember but whenever— whenever—

"[DEFENSE COUNSEL]: Object. Move to strike.

"THE COURT: Overruled. He's explaining his answer.

"[MICHAEL]: Whenever I don't remember when I heard it or found it out, but when I did, I thought to myself, the couch, you know, what the— nothing had to do with the couch.

"[DEFENSE COUNSEL]: Objection. Nonresponsive, Your Honor.

"THE COURT: Overruled. Sir, if you need to explain your answer let the Court know, okay.

"[MICHAEL]: Okay.

"THE COURT: I understand that there may be times that you need to explain your answer. The question many times calls for that. You just have to let the Court know then I'll allow you to explain your answer, okay.

"[MICHAEL]: Okay.

## B.    Forfeiture

Casey admits he has forfeited any statutory claim of judicial bias, including a claim under Code of Civil Procedure section 170.6, and therefore does not advance any such claim on appeal. However, since he did not object to any alleged judicial bias on any basis at all, he has also potentially forfeited the Constitutional basis for his claim. He relies on *People v. Banks* (2014) 59 Cal.4th 1113 to argue he has not forfeited his Constitutional basis because his failure to object is excusable because an objection would

have been futile due to "pervasive judicial bias." (*Id.* at p. 1177 [pervasive judicial bias does not necessarily require objection to preserve issue because such an objection may be futile].) We reject Casey's claims on the merits and therefore need not decide the issue of forfeiture.

### C.    Basic law

"Although 'the trial court has both the duty and the discretion to control the conduct of the trial' [citation], 'the Due Process Clause clearly requires a "fair trial in a fair tribunal," [citation], before a judge with no actual bias against the defendant or interest in the outcome of his particular case. [Citations.] The role of a reviewing court 'is not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid. Rather, we must determine whether the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial." (*People v. Harris* (2005) 37 Cal.4th 310, 346—347 (*Harris*).)

In *People v. Freeman* (2010) 47 Cal.4th 993 (*Freeman*), our Supreme Court, relying on the United States Supreme Court case *Caperton v. A.T. Massey Coal Co., Inc.* (2009) 556 U.S. 868, described the framework for analyzing due process claims based on judicial bias: "[W]hile a showing of actual bias is not required for judicial disqualification under the due process clause, neither is the mere appearance of bias sufficient. Instead, based on an objective assessment of the circumstances in the particular case, there must exist ' "the probability of actual bias on the part of the judge or decisionmaker [that] is too high to be constitutionally tolerable." ' " (*Freeman, supra,* 47 Cal.4th at p. 996.)

The *Freeman* court further noted:

> "[The United States Supreme Court] has also made it abundantly clear that the due process clause should not be routinely invoked as a ground for judicial disqualification. Rather, it is the exceptional case presenting extreme facts where a due process violation will be found. [Citation.] Less

extreme cases—including those that involve the mere appearance, but not the probability, of bias—should be resolved under more expansive disqualification statutes and codes of judicial conduct." (*Freeman, supra,* 47 Cal.4th at p. 1005.)

Here, based on our review of the record, we conclude Casey fails to establish he was deprived of his constitutional right to a fair and impartial tribunal.[6] We address each of his three claimed instances of bias in turn.

### D.     Analysis

#### 1.     *Bias during M.'s cross-examination*

Casey complains about the trial court's halting M.'s cross-examination to have a sidebar discussion.  At the time of the sidebar, his counsel had been questioning M. regarding discrepancies in her prior statements, and these discrepancies were the foundation of the defense's theory that M.'s testimony was unreliable.  He contends the breaks in the cross-examination "depriv[ed] the defense of [M.'s] answer" regarding the discrepancies.  First, the trial court in no way curtailed counsel's cross-examination.  If the court's calling a sidebar interrupted M.'s answer to any pending question, defense counsel could have asked the question again at the beginning of the next day.  Moreover, there is nothing in the record to suggest the court halted cross-examination for the improper purpose of hindering the defense's cross-examination, which Casey does not even contend to be the case.  Instead, the record shows the court allowed defense counsel to thoroughly cross-examine M. and did not in any way limit the scope of cross-examination.  Indeed, the court stated outside the presence of the jury:  "I did not interrupt your [i.e., defense counsel's] questioning, that is why I had a sidebar.  We'll make determinations as appropriate and I certainly want you to do whatever you think is appropriate for your defense of Mr. Casey."  Sidebar discussions routinely occur in trials,

---

[6] Were we to conclude there was a probability of actual bias, Casey's convictions would be reversible per se.  (*Arizona v. Fulminate* (1999) 499 U.S. 279, 306—308; *People v. Anzalone* (2013) 56 Cal.4th 545, 553—554.)

and Casey's claim that these breaks in cross-examination demonstrate a bias against Casey or his counsel is without merit.

Casey also complains that during a discussion outside the presence of the jury the court mispronounced defense counsel's name and unfairly accused her of bringing M. to tears the day before. He calls the mispronunciation "a mark of disrespect." This is not a serious contention because this was the only time throughout the entire trial the court mispronounced counsel's name, and it was a slight mispronunciation that was obviously an honest mistake.

Regarding M. being brought to tears, Casey contends the trial court's blaming his counsel for making M. cry demonstrates his dislike for Casey's counsel. He also argues the court unfairly saddled his counsel with the responsibility for M.'s welfare by charging her with asking for a break whenever she saw M. was under distress. However, the record does not support these arguments. First, while it may seem the court initially blamed defense counsel for making M. cry, the court later told defense counsel, "You are correct, she was crying earlier during [the prosecutor's] questioning[.]" Additionally, while the court was obviously concerned with M.'s wellbeing, the court did nothing more than note that M. was becoming upset during cross-examination, and only suggested counsel ask for a break whenever she felt it may be appropriate to do so in order to give M. a break. Defense counsel directly responded to that suggestion with: "I sure will, Your Honor, and that is what I did yesterday. I sure will. I'll take the Court's direction like I did yesterday and do that." While the record indicates things may have gotten a bit heated during the chambers conference the day before, the record falls well short of demonstrating the court harbored a personal dislike for defense counsel that would evidence a "probability of actual bias" against the defense.

### 2. *Bias during cross-examination of Michael*

Casey additionally contends the trial court demonstrated its bias against defense counsel and the defense during Michael's testimony. Specifically, Casey contends the

21.

trial court's erroneous evidentiary ruling that defense counsel had misstated the evidence in one of her questions demonstrated bias, when considered in light of the surrounding circumstances. We disagree.

The trial court ultimately reversed its erroneous ruling after listening to a readback of Michael's testimony and realizing defense counsel had not misstated Michael's testimony. However, Casey complains about the court's remarking, "Well, it is great that you have it written but I'll sustain the objection," in the jury's presence. He claims this was "disrespectful sarcasm" that evidenced bias. He also complains the court "disparaged the defense" by saying, "He's [i.e., Michael] trying to explain a very difficult question *that you formulated*." (Emphasis in appellant's opening brief.) Furthermore, he complains of the court's dismissing the jury from the courtroom to have a sidebar discussion regarding this evidentiary issue, and also of the court's failing to apologize to defense counsel for its error.

None of this, viewed objectively, demonstrates a probability of actual bias against the defense. The record does not indicate any words or actions by the trial court which would leave the jury with a bad impression of defense counsel. Juries are commonly excused from the courtroom as issues come up during trial, and there is nothing to suggest the jury here would have developed a negative view of defense counsel for perhaps creating the need for a short break in the trial. Moreover, neither the mistaken evidentiary ruling nor the court's method of correcting it demonstrate actual bias. The trial court prudently dismissed the jury, listened to a read back, and admitted and corrected its mistake on the record. The court's correcting its mistake benefitted the defense. The absence of an express apology is also not probative of a probability of actual bias because there is no indication the court intentionally erred; rather, it was an honest mistake made in the middle of testimony, and it is not customary to expect judges to apologize after realizing and correcting their mistakes.

While the trial court's statement of, "Well, it is great that you have it written …[,]" was unnecessary, trial counsel did not complain about it and the record does not demonstrate that this could fairly be described in context as "disrespectful sarcasm." Similarly, we reject Casey's suggestion that the court disparaged the defense by saying Michael was trying to answer a difficult question formulated by defense counsel. This suggestion implies the court was tacitly accusing defense counsel of having done something wrong in formulating her question, but the record does not bear this out.

The record does not demonstrate an actual probability of bias regarding this second incident.

### 3. *Trial judge's interaction with Michael*

As to Casey's claim the court exhibited bias against the defense by acting as a prosecutor in telling Michael he could ask the court for a chance to clarify his testimony, " ' "a judge should be careful not to throw the weight of his judicial position into a case, either for or against the defendant." ' [Citation.] But 'the object of a trial is to ascertain the facts and apply thereto the appropriate rules of law, in order that justice within the law be truly administered.' [Citation.] To this end, 'the court has a duty to see that justice is done and to bring out facts relevant to the jury's determination.' [Citation.] '[It] is not merely the right but the duty of a trial judge to see that the evidence is fully developed before the trier of fact.' ([Citation]; see § 1044 ['It shall be the duty of the judge to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved.'].)" (*People v. Abel* (2012) 53 Cal.4th 891, 917 (*Abel*).)

"In deciding whether a trial court has manifested bias in the presentation of evidence, we have said that such a violation occurs only where the judge ' "officiously and unnecessarily usurp[ed] the duties of the prosecutor … and in so doing create[d] the

23.

impression that he [was] allying himself with the prosecution." ' " (*Harris, supra,* 37 Cal.4th at p. 347.)

Casey complains the court told Michael he could ask to explain his answers and the court would allow him to do so. Casey complains this was tantamount to the trial court assuming the prosecutor's role. We disagree; the trial court did nothing of that sort. The court's advisement to Michael "was consistent with the court's duty to see that justice is done and to bring out facts relevant to the jury's determination." (*Abel, supra,* 53 Cal.4th at p. 917.) The trial court did not ask Michael questions and did not otherwise do anything to elicit specific testimony from him. The prosecutor was not aided nor was the defense hindered by the court's advisement. There is also nothing in the words or context of the advisement to Michael to suggest the court would not allow Michael to explain an answer he gave to one of the prosecutor's questions. Under these facts, we conclude the trial court did not assume the role of the prosecutor at any time.

All of Casey's claims of judicial bias fail on the merits because there is nothing in the record establishing he was deprived of his constitutional right to a fair and impartial tribunal. Moreover, "[he] never expressed any concern that the judge was prejudiced against him during trial nor did he request the judge to recuse himself." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1112 (*Guerra*), overruled on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151; *People v. Johnson* (2018) 6 Cal.5th 541, 592.) "[His] willingness to let the entire trial pass without [a] charge of bias against the judge … strongly suggests [his claims] are without merit." (*Guerra,* at p. 1112, citing *People v. Tappan* (1968) 266 Cal.App.2d 812, 816—817 [following the trial judge's alleged prejudicial pretrial comment, defendant's failure to complain of judge's bias during trial showed defendant's confidence in judge's impartiality].)

## II.     Fines, fees, and assessments

Although he did not object below, Casey contends the fines, fees, and assessments imposed by the trial court violate his right to due process under the Fifth and Fourteenth

Amendments to the United States Constitution because he is unable pay. He contends the matter must be remanded for the trial court to conduct a hearing on his ability to pay, and to thereafter reset the fines and fees. He relies on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), which was decided after his sentencing hearing. To the extent his arguments are forfeited, he alleges ineffective assistance of counsel. We conclude he has forfeited his claim and his counsel did not render ineffective assistance, and accordingly affirm the imposition of all the fines, fees, and assessments.

### A.    Additional factual background

Because Casey did not argue in the trial court that he was unable to pay, the record regarding his financial circumstances is not developed. However, the probation officer's report notes he was widowed with no living children and made $1,500 biweekly as a transporter of persons. Trial testimony revealed he received room and board as payment for his services as M.'s nanny, and it is unclear whether he also received monetary compensation.

The trial court imposed a $4,500 restitution fine (§ 1202.4, subd. (b)); a $4,500 parole revocation fine, stayed pending successful completion of parole (§ 1202.45); a $300 fine pursuant to section 290.3 and found Casey had the ability to pay that fine;[7] a court security fee of $40 per count for a total of $120 (§ 1465.8); a criminal conviction assessment of $30 per count for a total of $90 (Gov. Code, § 70373); and a probation report fee of $296 (§ 1203.1b, subd. (a)). Victim restitution was reserved.

After the oral pronouncement of all of the fines, fees, and assessments, defense counsel stated: "Your Honor, would the Court reconsider the 290.3 fine as Mr. Casey is

---

[7] Regarding this section 290.3 fine, the court stated: "It is further ordered that pursuant to Penal Code section 290.3, the defendant be ordered to pay a fine of $300. The Court determines that the defendant does have the ability to pay such fine." The court did not make any other ability to pay findings with respect to any of the other imposed fines, fees, or assessments.

indigent and does not have any ability to pay the fine[?]" The court responded: "Mr. Casey has hired private counsel and the Court finds that he has the ability to pay that." Defense counsel stated she was hired by Casey's family, but the court said it would not reconsider its order.

### B.     Analysis

*Dueñas* held that "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay" before it imposes any fines or fees. (*Dueñas, supra,* 30 Cal.App.5th at p. 1164; see *id.* at p. 1167.) This court has rejected that contention. (*People v. Aviles* (2019) 39 Cal.App.5th 1055, 1069 (*Aviles*) [*Dueñas* "incorrectly relied upon a due process analysis to examine ... constitutional objections to the [trial] court's imposition of ... fines, fees, and assessments ...."]; accord, *People v. Lowery* (2020) 43 Cal.App.5th 1046, 1056-1057 [due process not violated when defendants are not denied access to the courts, are not prohibited from presenting a defense, are not incarcerated due to an inability to pay prior fees, fines or assessments, do not face ongoing unintended punitive consequences, and do not suffer a violation of a fundamental liberty interest].)

Other courts have declined to extend the holding of *Dueñas* beyond the unique facts of that case, which involved an indigent, homeless, mother of two who subsisted on public aid while suffering from cerebral palsy (*Dueñas, supra,* 30 Cal.App.5th at pp. 1160-1161), and who accumulated repeated criminal conviction assessments and fines in a series of "cascading consequences" stemming from "criminal proceedings driven by, and contributing to, [the defendant's] poverty" (*id.* at pp. 1163-1164). (See *People v. Caceres* (2019) 39 Cal.App.5th 917, 928-929 [declining to apply *Dueñas's* "broad holding" beyond its unique facts]; *People v. Johnson* (2019) 35 Cal.App.5th 134, 138 [distinguishing *Dueñas* on its facts].)

Here, we need not consider Casey's *Dueñas*-based challenge because he has forfeited the issue. He acknowledges his counsel did not object to the court's imposition

of the fines, fees, and assessment without an ability to pay hearing, and did not object to the court's allegedly "conclusory statement" he had the ability to pay the section 290.3, subdivision (a) fine without citing any facts in support of its finding. However, he maintains his counsel's failure to object did not result in forfeiture because *Dueñas* had not yet been decided and its holding could not reasonably have been anticipated. We disagree. The court ordered Casey to pay a restitution fine of $4,500. (§ 1202.4, subd. (b)(1).) When the court imposes a restitution fine greater than the $300 statutory minimum, "[s]ection 1202.4 expressly contemplates an objection based on inability to pay." (*People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153 (*Frandsen*); accord, *Aviles, supra,* 39 Cal.App.5th at p. 1073.) While *Dueñas* had not been decided at the time of his sentencing hearing, Casey had the statutory right to object to the $4,500 restitution fine and to demonstrate his inability to pay, and such an objection "would not have been futile under governing law at the time of his sentencing hearing." (*Frandsen,* at p. 1154; accord, *Aviles,* at pp. 1073-1074; *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033 (*Gutierrez*) ["[E]ven before *Dueñas* a defendant had every incentive to object to imposition of a maximum restitution fine based on inability to pay because governing law as reflected in the statute [citation] expressly permitted such a challenge."].)

Similarly, section 290.3, subdivision (a) mandates a $300 fine unless the court finds the defendant is unable to pay it. Casey's counsel asserted he was "indigent" and asked the court to "reconsider" its finding that he had the ability to pay it, but counsel did not present or argue any facts regarding Casey's inability to pay nor do anything else to meaningfully contest the court's finding, e.g. request an inability to pay hearing. All counsel did was ask for a reconsideration, which the court denied. Regarding the probation report fee imposed under section 1203.1b, although that section "imposes an express procedural requirement of a knowing and intelligent waiver of the right to a court hearing on the defendant's ability to pay," the burden is on the defendant to assert noncompliance with that requirement. (*People v. Trujillo* (2015) 60 Cal.4th 850, 858.)

27.

Here, Casey did not assert such noncompliance nor make any other objection to this fee. His failure to object to these two assessments forfeits his challenge to them.

The remaining fee and assessment—the court security fee (§ 1465.8, subd. (a)(1)) and criminal conviction assessment (Gov. Code, § 70373)—are mandatory, and Casey lacked the statutory right to object based on ability to pay. Nonetheless, he forfeited the right to object to these assessments as a practical matter. Although the fees and assessments were mandatory, nothing in the record of the sentencing hearing indicates he was foreclosed from challenging these assessments in the trial court in the first instance. (*Aviles, supra,* 39 Cal.App.5th at p. 1074; *Frandsen, supra,* 33 Cal.App.5th at p. 1154.) "[Casey] plainly could have made a record had his ability to pay actually been an issue. Indeed, [he] was obligated to create a record showing his inability to pay the ... restitution fine, which would have served to also address his ability to pay the assessments." (*Frandsen,* at p. 1154; accord, *Aviles,* at p. 1074.)

Casey asserts that, if we find forfeiture, his trial counsel was ineffective for failing to object to the imposition of fines and fees based on an inability to pay. He bears the burden of demonstrating ineffective assistance of counsel. (*People v. Mickel* (2016) 2 Cal.5th 181, 198.) " '[A] defendant claiming a violation of the federal constitutional right to effective assistance of counsel must satisfy a two-pronged showing: that counsel's performance was deficient, and that the defendant was prejudiced, that is, there is a reasonable probability the outcome would have been different were it not for the deficient performance.' [Citation.] Rarely is ineffective assistance of counsel established on appeal since the record usually sheds no light on counsel's reasons for action or inaction." (*People v. Woodruff* (2018) 5 Cal.5th 697, 736.)

In determining whether counsel's performance was deficient, we consider whether " ' " 'counsel's representation fell below an objective standard of reasonableness under prevailing professional norms ….' " ' " (*People v. Johnson* (2016) 62 Cal.4th 600, 653.) Reversal is permitted " 'only if (1) the record affirmatively discloses counsel had no

rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.' " (*People v. Arredondo* (2019) 8 Cal.5th 694, 711.) Regarding the second prong, "prejudice must be affirmatively proved; the record must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " (*People v. Bolin* (1998) 18 Cal.4th 297, 333.)

However, when a defendant seeks to establish a claim of ineffectiveness of counsel on matters not disclosed by the record on appeal, a petition for writ of habeas corpus is the appropriate procedure. (*People v. Delgado* (2017) 2 Cal.5th 544, 559; *People v. Pope* (1979) 23 Cal.3d 412, 426, fn. 17, overruled on another ground in *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, fn. 10; see also *People v. Ledesma* (1987) 43 Cal.3d 171, 218—219 [holding that although the record raised serious doubts about counsel's performance, it was not sufficient to demonstrate ineffective assistance, however, a consolidated habeas corpus petition did reveal inadequate performance.]) A petition for habeas corpus extends far beyond the record on appeal, while an appeal is limited to the four corners of the underlying record. (*People v. Waidla* (2000) 22 Cal.4th 690, 749, fn. 1.)

We cannot say trial counsel had no conceivable tactical purpose for not requesting an ability to pay hearing. Although defendant was 66 years old at the time of sentencing and (according to the probation report) had type II diabetes, chronic arthritics, sciatica, and back pain, he had been working as a nanny and a transporter at the time of his offense. Also, while the probation report lists his physical health as only "fair"—as opposed to "good"—the record is silent as to whether he has a diminished capacity to work a job. (See *Aviles, supra,* 39 Cal.App.5th at p. 1076 [court not limited to considering defendant's *present* ability to pay but may consider defendant's ability to pay

in the future, which includes ability to obtain prison wages].)  The record is also silent as to whether he has money in savings or owns any valuable property.  We note counsel's representation that his family paid for his retained counsel and that he is indigent, but that does not necessarily mean he has no savings or valuable property that could be used to pay his fines, fees, and assessments.  It is thus conceivable counsel concluded there was insufficient evidence of Casey's inability to pay, which would explain why she only asked the court to "reconsider" its ability to pay finding regarding the section 290.3 fine without presenting evidence or requesting an ability to pay hearing.  As such, the record does not affirmatively exclude a rational basis for trial counsel's choice, and therefore Casey has failed to establish ineffective assistance of counsel.

## III.    Abstract of judgment

Casey correctly identifies a clerical error in the abstract of judgment.  On line 6 a., the abstract shows he received a 15-years-to-life sentence on count 3.  Further, on line 1, the abstract lists the violation correctly as "oral copulation or sexual penetration w/child." However, line 1 states the code section that was violated in count 3 as "288(a)."  This is incorrect.  The code section violated in count 3 was 288.7, subdivision (b).

The abstract also correctly states on line 1 that the count 1 offense was "lewd act upon a child" but lists the violated code section as "288.7(b)."  This is also incorrect.  The code section violated in count 1 was 288, subdivision (a).

The listed code sections need to be switched.  On line one, for the first entry, which is count 3, the code section should be 288.7, subdivision (b).  For the third entry, which is count 1, the code section should be 288, subdivision (a).

30.

## DISPOSITION

The judgment is affirmed.  The abstract of judgment shall be amended as stated herein and certified copies forwarded to the appropriate entities.

SNAUFFER, J.

WE CONCUR:


FRANSON, Acting P.J.


PEÑA, J.